MELISSA HOLYOAK, United States Attorney (#9832)
TODD C. BOUTON, Assistant United States Attorney (#17800)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone:  (801) 524-5682
todd.bouton@usdoj.gov

_____

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JENNIFER JOMA, <br><br> Defendant. | **UNITED STATES' POSITION REGARDING DETENTION** <br><br><br> Case No. 1:26-cr-00031-HCN <br><br> Judge Howard C. Nielson, Jr. |

## INTRODUCTION

This case is about some state court clerks who abused their position of trust and took the law into their own hands by helping an illegal alien evade a lawful arrest by ICE.[1] After they overheard that ICE was at the courthouse to arrest someone, they improperly accessed court databases to determine who was not born in the United States. They then snuck every suspected illegal alien who was at the courthouse out a back door, where ICE, who was waiting in the parking lot for their target to leave the building, could not see them. One of the court clerks, Jennifer JOMA, even arranged to meet three of the aliens outside the courthouse and to pick them up in her car. She then drove them away and dropped them off somewhere else so ICE could not arrest any of them. The court clerks did not know who ICE intended to arrest. Nor did they care why ICE wanted to arrest them.

Acting as self-appointed anti-ICE vigilantes, the defendants and others took it upon themselves to obstruct immigration proceedings and the lawful enforcement of United States immigration laws. Whatever Ms. Joma's personal feelings regarding immigration policies or laws, this was a crime. In fact, she is charged with at least four crimes.

---

[1] "ICE" stands for U.S. Immigration and Customs Enforcement.

More specifically, Ms. Joma is charged with:

(1)    Conspiracy to Transport and Harbor Illegal Aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I);

(2)    Harboring Illegal Aliens in violation of 8.S.C. § 1324(a)(1)(A)(iii);

(3)    Transporting Illegal Aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii); and

(4)    Obstruction of Proceedings Before Departments and Agencies in violation of 18 U.S.C. § 1505.

☒    **The United States is not seeking detention. But it is seeking conditions of release.**[2]

The United States contends that the defendant (Ms. Joma) should be released on the following conditions:

- She not commit any other Federal, State, or local crime. 18 U.S.C. § 3142(c)(1)(A);

- She be required to report to an assigned pretrial officer. 18 U.S.C. § 3142(c)(1)(b)(vi);

- She be required to maintain employment, or, if unemployed, actively seek employment. 18 U.S.C. § 3142(c)(1)(b)(ii);

- She be required to surrender her passport, if any. 18 U.S.C. § 3142 (c)(1)(b)(xiv);

- She be ordered not to discuss the case with her codefendant, Lauren Morrow, or with any other witnesses. 18 U.S.C. § 3142(c)(1)(b)(xiv); and

- She be advised that interfering with any other attempted arrests of illegal immigrants would constitute a violation of federal law. 18 U.S.C. § 3142(c)(1)(b)(xiv).

☐    Detention is not at issue because this is an immigration reentry case where the defendant has opted to participate in the fast-track program, which includes agreeing to detention for the pendency of this case.

☐    The United States moves for detention based on current information.

The United States' positions in this preliminary pleading could change after reviewing the Pretrial Report or learning of additional evidence.  The United States reserves the right to assert positions even if the boxes next to those positions are not checked below, raise

---

[2] Where a defendant is charged with a federal Class A misdemeanor, conditions of release are appropriate. 18 U.S.C. § 3142(a); 18 U.S.C. § 3156(b)(2) (defining "offense" to exclude Class B and C, but not Class A misdemeanors).

additional arguments, and file additional pleadings in support of detention.

The United States' motion for detention is:

☐  Pursuant to 18 U.S.C. § 3142(f)(1) because defendant is charged with:

☐  **(A**) a crime of violence (*see* 18 U.S.C. § 3156(a)(4)), a violation of 18 U.S.C. § 1591 (sex trafficking of children), or an offense under § 2332b(g)(5)(B) (specific enumerated crimes) for which a maximum term of imprisonment of 10 years or more is prescribed; **or**

☐  **(B)** an offense for which the maximum sentence is life imprisonment or death; **or**

☐  **(C)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); **or**

☐  **(D)** any felony if the defendant has been convicted of two or more offenses described in (a) through (c) above, or two or more State or local offenses that would have been offenses described in (a) through (c) above if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; **or**

☐  **(E)** any felony that is not otherwise a crime of violence but involves: **(i)** a minor victim; **(ii)** the possession or use of a firearm or destructive device (as defined in 18 U.S.C. § 921); **(iii)** any other dangerous weapon; or **(iv)** a failure to register under 18 U.S.C. § 2250;

**OR**

☐  Pursuant to 18 U.S.C. § 3142(f)(2) because the case involves:

☐  **(A)** a serious risk the defendant will flee; **or**

☐  **(B)** a serious risk the defendant will obstruct or attempt to obstruct justice, or threaten, injure, intimidate, attempt to threaten, injure or intimidate a prospective witness or juror.

### Procedure

The defendant may seek a continuance of the detention hearing of up to five days, and the United States may seek a continuance of up to three days. 18 U.S.C. § 3142(f). During any such continuance, the defendant shall be detained. *Id*. The rules concerning the admissibility of evidence do not apply at the detention hearing. *Id*. The United States has

the burden of persuasion by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community or by a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required. *Id*.; *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003).

### Rebuttable Presumption

☐  A rebuttable presumption applies and the defendant bears the burden to produce some credible evidence to rebut this presumption. The United States acknowledges that it retains the burden of persuasion. The statutory presumption applies:

   ☐ Pursuant to 18 U.S.C. § 3142(e)(2) *(previous violator)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because:

      **(A)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed; *and*

      **(B)** the defendant committed that offense while on release pending trial for a Federal, State, or local offense; *and*

      **(C)** a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for that, whichever is later.

   ☐ Pursuant to 18 U.S.C. § 3142(e)(3) *(narcotics, firearm, other offenses)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

      ☐ **(A)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

      ☐ **(B)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

      ☐ **(C)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 or more is prescribed;

      ☐ **(D)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**

☐ **(E)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

### Factors to Be Considered

The United States may present arguments, proffer evidence, or provide testimony at the scheduled detention hearing supporting the *proposed conditions of release* for the defendant including, but not limited to:

☒  The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm or destructive device.  (18 U.S.C. § 3142(g)(1)).

## 1.    THE NATURE OF THE OFFENSE

**The Defendant and her coconspirators helped at least three illegal aliens escape out a back door of the courthouse so that ICE could not arrest them or deport them.[3]**

On April 9, 2026, Jennifer JOMA, Lauren Kelsey MORROW, and at least two other court clerks were working at the Logan City Municipal Justice Court in Logan, Utah (Justice Court). At about 1:25 p.m., an ICE Enforcement and Removal Officer (ICE Officer)[4] entered the Justice Court to arrest an illegal alien named J.G. for Title 8 Immigration related charges. The ICE Officer had an administrative warrant for J.G.'s arrest. J.G. was at the Justice Court for a court appearance.

The ICE Officer entered the waiting room in the courthouse and waited for some people to go into the courtroom(s). He then approached the bailiff, a Logan City Police Officer (the Bailiff), and informed him of the impending arrest of J.G. The Bailiff allowed the ICE Officer to enter the back of the courtroom where J.G. was attending his court hearing. The Bailiff then entered a secure area behind the clerk's window and discussed ICE's presence and purpose with a supervisor, out loud, on a cell phone. The Bailiff notified the judge who told him to ask ICE not to take any enforcement action inside the courtroom to avoid a disturbance. The Bailiff complied and entered the courtroom to relay the judge's message to the ICE Officer. The Bailiff took the ICE Officer back to the secure area. Without closing the door, the Bailiff told the ICE Officer the judge's request. The ICE Officer then left the area behind security and went into the main waiting room and up

---

[3]One of the suspected illegal aliens appears to have been a lawful permanent resident.

[4] "ICE" is used herein as a short form for the immigration officials involved.

to the clerk's window. Then, at about 1:40 p.m., the ICE Officer spoke to MORROW at the clerk's window. The ICE Officer then went outside and waited in his car for his target to leave the courthouse before trying to arrest him.

After JOMA and MORROW learned that ICE was there to arrest someone, they sprang into action. They and others at the courthouse immediately began taking actions to try to figure out whom ICE was there to arrest. Another clerk in the courtroom helped them. This clerk used both the courtroom phone and texts on a cell phone to continue to contact MORROW and to keep MORROW updated on the court proceedings. This clerk did so in open court, without the judge or the Bailiff noticing what was going on.

To identify the individual that ICE might be there to arrest, MORROW and JOMA decided to misuse court databases to search for the court attendees' criminal histories to determine the alienage of everyone who was on the court docket. They began searching the criminal histories that reflect a person's country of birth to help identify which illegal alien ICE intended to arrest. At the same time, MORROW remained in contact, via text messages, with another clerk who watched everyone in the courtroom.

At about 1:55 pm, a fourth clerk returned to the courthouse and was notified by MORROW that ICE was there to arrest someone. This clerk was immediately asked to start running reports of individuals on the docket, including J.G. During their searches, they identified that someone in the courtroom named J.M. was a citizen of Guatemala.

At approximately 2:00 p.m. J.M. left the courtroom. Before he could leave the courthouse, JOMA and MORROW contacted him from the clerk's office window. After talking to J.M., JOMA entered the waiting room and appeared to show J.M. where ICE was parked in the parking lot with her cell phone in her hand. While MORROW remained at the clerk's window to watch for ICE, JOMA led J.M. back into the secure area and down a few hallways into a back maintenance room on the opposite side of the building. From there she helped him leave the courthouse without being seen by ICE. (Exhibit 1).

While JOMA was taking J.M. by the hand through the secure area, she remained in contact with her coconspirators via cell phone. MORROW then followed JOMA to where J.M. was let out of the courthouse through a maintenance room. This room had a back door to the outside of the courthouse, where ICE could not see anyone leave the building. Meanwhile, another clerk covered the clerk's window and appeared to act as a lookout.

After sneaking J.M. out the back door of the courthouse, MORROW and JOMA noticed a surveillance camera. This did not appear to deter or concern them. JOMA waved and smiled. MORROW waived and then used her middle finger to flip off the camera. (See Exhibit 1).

Between about 2:00 p.m. and 2:25 p.m., JOMA, MORROW, and another clerk continued to remain in constant contact with each other in person, and via cell phone and in contact with the clerk in the courtroom via cell phone. They continued to locate records of people in court who were born in a foreign country whom ICE might be there to arrest.

At about 2:25 p.m., a woman named M.A., who was born in Mexico, left the courtroom and was contacted by JOMA and MORROW. They told M.A. ICE was there. While they spoke, M.A. gave JOMA her car keys. JOMA then went to the parking lot and retrieved some of M.A.'s personal belongings from her car.

Just before 2:35 p.m., J.G. (ICE's target) and a woman who came with him to court, M.M., left the courtroom. MORROW and JOMA also contacted them, while another clerk appeared to watch ICE's location and update MORROW on ICE's position.

JOMA then took J.G., M.M., and M.A. and sat them in the waiting room to explain to them what was going on. JOMA and MORROW had a conversation. Then JOMA took the three people past the metal detectors while MORROW opened a door to let the three unauthorized people into the secure clerk's area. As JOMA and MORROW led the three unauthorized people into the secure area, the Bailiff left the courtroom and began trying to figure out what was going on. He followed them into the secure area. (See Exhibit 1).

When the Bailiff entered the secure area, MORROW intercepted him and tried to distract him. She gave him a false explanation for why the unauthorized people were there. Another clerk also tried to help distract him. As JOMA began to lead the three unauthorized people toward the back maintenance room and out of the courthouse, the Judge left the courtroom. The judge went into his office and left the door open. He did not see the unauthorized people because his vision was obstructed. The clerk who had been in the courtroom with the judge then came into the secure area. She looked at JOMA and the three unauthorized people who had just recently left the courtroom. Then she went into the judge's office and closed the door. From the footage it appears that this clerk closed the judge's door to prevent the judge from seeing the unauthorized people.

With the door closed, and MORROW and another clerk distracting the Bailiff, JOMA then led the three unauthorized people through the secured hallways and into the back maintenance room that led outside. The three people waited in the back maintenance room with the light off for a few minutes while JOMA returned to the secure court clerk area to get the keys to her vehicle. JOMA then left the building and got into her car. JOMA then drove around the building and parked on the street outside the back side of the courthouse closest to the back maintenance room door. The three unauthorized aliens came out the maintenance door and got into JOMA's car. Then JOMA drove off with them. JOMA was gone until about 3:10 p.m.

Meanwhile, after court had concluded for some time, another ICE Officer came into the courthouse and came to the clerk's window to see if his target was still in the building. He asked MORROW if she knew how the targeted illegal alien could get out if ICE was watching the door the whole time. MORROW did not tell him that she and JOMA had led four aliens out the back door of the courthouse. Nor did she tell him that JOMA had driven three aliens away in her car out of sight of ICE.

☒  The weight of evidence against the defendant.  (18 U.S.C. § 3142(g)(2)).
See above.

☒  The history and characteristics of the defendant including the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history and record concerning court proceedings.  (18 U.S.C. § 3142(g)(3)(A)).

**Ms. JOMA has no identified criminal history. She no longer works at the Justice Court and thus could not abuse her former position to repeat her charged crimes. But she violated a position of trust as a court clerk to obstruct a lawful arrest. She apparently did so for political or philosophical reasons— deeming herself above the law and somehow justified in her actions.**

☐  Whether, at time of the current offense or arrest, the defendant was on probation, parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.  (18 U.S.C. § 3142(g)(3)(B)).

☐  The nature and seriousness of danger to any person or to the community that would be posed by the defendant's release.  (18 U.S.C. § 3142(g)(4)).

☐  The defendant's lack of legal status in the United States.  The defendant's legal status is:

☐  How the defendant would be subject to removal or deportation after serving a period of incarceration.

☐  The defendant's significant family or other ties outside of the United States.

☐  The defendant's use of aliases or false documents.

☐  The defendant's prior attempts to evade law enforcement.

☐  How the defendant's proposed residence, employment, or proposed treatment programs have not been verified.

☐  The defendant's prior failures to appear for court proceedings.

☐  Other reasons including:

## Victim Notification

☐   The United States has notified any identified victim, or attempted to do so, pursuant to 18 U.S.C. § 3771.

The position of the victim(s) on the detention of the defendant is:

☐   The victim(s) in this matter seek(s) a no contact order.

☒   This matter does not involve a victim requiring notification.

DATED this 9th day of June, 2026.

MELISSA HOLYOAK
UNITED STATES ATTORNEY


_/s/ Todd C. Bouton_____
TODD C. BOUTON
Assistant United States Attorney

# Exhibit 1

## (Screenshots)





